**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

**NATHAN ANDREW BAGLEY**                                                      **PLAINTIFF**

**v.**                                    **No. 2:19-cv-00164-JM**

**HELENA-WEST HELENA SCHOOL DISTRICT, et al.**                     **DEFENDANTS**


**MEMORANDUM BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This Memorandum Brief is submitted in support of the Motion for Summary Judgment ("Motion") filed by Defendants, Helena-West Helena School District ("District"), Helena-West Helena School Board of Directors ("Board"), Helena-West Helena School Board Members, Loistyne Burrell, Sanetta Davis, Lynn Boone, Earnest Simpson, Jr., Daniel Strickland, Janice Williams, and Troy Bobo, individually and in their official capacity, (together the "District" or "District Defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons discussed herein, Defendants are entitled to summary judgment as a matter of law.

## INTRODUCTION

This is an employment discrimination case.  Plaintiff, Nathan Bagley, a white male, contends that the District Board intentionally discriminated against him when it failed to select him for the position of Superintendent, in or around June 27, 2019, on account of his race.[1]  *See* Complaint, Dkt. No. 1 at ¶ 24.  The previous superintendent, John Hoy, a black male, resigned effective at the end of the 2017-2018 school year, June 30, 2018.  *Id*. at ¶¶ 17-19.  The District

---

[1] In Bagley's EEOC Charge he alleges discrimination on the basis of his sex, but this claim is not incorporated into his complaint, and has therefore been abandoned.  To the extent Bagley is seeking to bring a claim based on his sex, the analysis is the same and Defendants are seeking a full dismissal of all claims.

appointed Linda English, a black female, the then Deputy Superintendent, as Interim Superintendent with a final decision as to the permanent superintendent to be determined at a later date. *Id*. at ¶¶ 20-22. The District reviewed applications for the position of superintendent, interviewed candidates and elected to name English the permanent Superintendent on June 27, 2019. *Id*. at ¶ 24.

Bagley alleges that the District selected the superintendent primarily based on race and denied him the position because he was white. *Id*. at ¶¶ 4-5. Bagley largely relies on claims that the superintendent interview committee was all black and it selected a black candidate. Bagley further alleges he was not selected for the position despite receiving the highest score among applicants based on a numeric rubric used by the committee. *Id*. at ¶¶ 21 and 23.

The Board had legitimate and non-discriminatory reasons for selecting English for the permanent position, namely, her experience as an administrator in the District, superior education level, and because she held a superintendent's license, while Bagley did not. Furthermore, Bagley was in the unique position of sitting as the Board president while applying for the position, and there were concerns by Board members that Bagley had manipulated the interview process to his favor. These legitimate reasons, coupled with the non-discriminatory interview process, led the Board to select English as the most qualified candidate for the permanent position. The Defendants deny that its decision to not employ Bagley for the permanent position was discriminatory and the Defendants deny all allegations that it violated any applicable law.

## STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56(a), summary judgment is proper if the moving party has identified each claim or defense on which summary judgment is sought and has established that there is no genuine

dispute as to any material fact. Fed. R. Civ. P. 56(a). The burden of establishing this nonexistence rests squarely upon the moving party. *Walling v. Fairmont Creamery Co.*, 139 F.2d 318, 322 (8th Cir. 1943). Rule 56(c) directs the moving party to support its assertion by:

> citing to practical parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials, or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

"[A] judge's function [at this stage] is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "All doubts are resolved against [the moving party], and his supporting affidavits and depositions, if any, are [to be] carefully scrutinized by the court." *Walling v. Fairmont Creamery Co.*, 139 F.2d 318, 322 (8th Cir. 1943). Accordingly, when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts").

In order to prevent summary judgment, the non-moving party must establish that a genuine issue of material fact exists by pinpointing significant probative evidence. *Matsushita*, 475 U.S. at 585-586 (*citing* Fed. R. Civ. P. 56(e)). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). Mere allegations or denials will not

suffice; rather, the non-moving party must come forward with specific facts showing a genuine issue for trial. *Matsushita*, 475 U.S. at 587.

Hence, a court may grant summary judgment if the moving party has established its right to a judgment with such clarity as to leave no room for controversy, and the non-moving party is not entitled to recover under any discernible circumstances. *See LeCroy v. Dean Witter Reynolds, Inc.*, 585 F. Supp. 753 (D.C. Ark. 1984).

## ARGUMENT AND AUTHORITY

**I.       The District did not discriminate against Bagley in violation of Title VII, but instead had legitimate, nondiscriminatory reasons for its decision not to select him for the position of superintendent.**

The District Board's decision not to select Bagley for the position of superintendent had nothing to do with his race.  Bagley fails to provide the necessary evidence to make a *prima facie* case of race discrimination.  Consequently, even if he was able to make a *prima facie* case on any of his claims, he still is not entitled to recover, as the Board had legitimate and nondiscriminatory reasons for hiring English over Bagley.  Further, Bagley is not able to demonstrate that the District's reasons were merely a pretext for intentional discrimination.  As a result, his claims should be dismissed.

### A.  Title VII – Legal Standard, Failure to Hire

In 1964, Congress enacted Title VII of the Civil Rights Act in an effort to eliminate the entire spectrum of disparate treatment of men and women in the workplace. *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 907 (8th Cir. 2006).  In effect, Title VII works to prohibit unlawful discrimination and retaliation practices by employers in the workplace. 42 U.S.C. § 2000e2(a). Title VII discrimination claims are analyzed under the familiar burden-shifting framework set out in the *McDonnell Douglas* line of cases. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct.

2148, 156 L. Ed. 2d 84 (2003); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-08, 113 S. Ct. 2742, 2746-48, 125 L. Ed. 2d 407 (1993); *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 713-715, 103 S. Ct. 1478, 1480-82, 75 L. Ed. 2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-256, 101 S. Ct. 1089, 1093-95, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). A case alleging a Title VII violation moves through three phases. *McCosh v. City of Grand Forks*, 628 F.2d 1058, 1062 (8th Cir. 1980).

"First, the Plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 252-53. A prima facie case of discrimination based on a failure-to-hire claim requires the Plaintiff to show that (1) he belongs to a protected class; (2) he applied and was qualified for a job for which the Defendant was seeking applications; (3) he was rejected; and (4) the Defendants hired someone from outside the protected class. *Arraleh v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006); *Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 702 (8th Cir. 2012). A plaintiff may carry this burden in one of two ways: (1) by offering direct evidence of the alleged discriminatory motive or action; or (2) by producing sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion. *Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285, 290 (8th Cir. 1982) (citing *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). If a plaintiff is unable to present direct evidence of an employer's alleged discriminatory behavior, he can raise an inference of such conduct using the framework articulated in *McDonnell Douglas*.

Should the plaintiff succeed in making a prima facie case, the burden shifts to the defendant employer to submit evidence demonstrating that the plaintiff was rejected, or that someone else was preferred, for a legitimate nondiscriminatory reason. *Texas Dep't of Cmty. Affairs*, 450 U.S.

at 254.  "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."  *Id.* at 255.  This burden is not onerous and need not be demonstrated by a preponderance of the evidence.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (quoting *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999)).

If the defendant successfully rebuts the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were instead a pretext for discrimination.  *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256.  To do so, the Plaintiff must either: (1) persuade the court that a discriminatory reason more likely motivated the employer, or (2) show that the employer's proffered explanation is unworthy of credence.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. at 804-805).  The plaintiff must provide evidence that does more than raise doubts about the wisdom and fairness of the employer's actions; instead, she must create a real question as to the genuineness of the employer's perceptions and beliefs. *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (quoting *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1118 (8th Cir. 2018)).  A plaintiff can only succeed at this stage if she presents sufficient evidence to demonstrate *both* that the employer's articulated reason for the adverse employment action was false, *and* that discrimination was the real reason.  *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (quoting *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1072 (8th Cir. 1998)).  Finally, "the ultimate burden of persuading the trier of fact that a defendant intentionally discriminated against a plaintiff remains at all times with the plaintiff."  *Id.* (citing *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 (1978)).

**B.  Title VII - Heightened Standard - Reverse Discrimination**

The Eighth Circuit follows the prevailing view that in order for a plaintiff of the majority class (here, a white male) to present a prima facie case of discrimination, he must show "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Duffy v. Wolle*, 123 F.3d 1026, 1036 (8th Cir. 1997).  *Duffy* explained, "[w]hite males, who as a group historically have not been hindered in the workplace because of their race or sex, are required to offer other particularized evidence, apart from their race, sex, that suggests some reason why an employer might discriminate against them."  *Id.* quoting *Bishopp v. District of Columbia*, 252 U.S. App. D.C. 156, 788 F.2d 781, 786 (D.C. Cir. 1986).  The "background circumstances" referenced in *Duffy* were not fully articulated, but subsequent courts within the Eighth Circuit, applying *Duffy*, have held that evidence which constitutes "background circumstances" can basically be divided into two categories: "(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites. . . and (2) evidence indicating that there is something "fishy" about the facts of the case at hand that raises an inference of discrimination."  *See Mower v. Westfall*, 177 F. Supp. 2d 940, 949 (S.D. Iowa 2001) quoting *Harding v. Gray*, 9 F.3d 150, (D.C. Cir. 1993).  "White males must offer other particularized evidence, apart from their race and sex, that suggests some reasons why an employer might discriminate against them."  *Betts v. Iowa Dep't of Nat. Res.*, No. 4-01-CV-20009, 2002 U.S. Dist. LEXIS 3538, at *20 (S.D. Iowa Feb. 25, 2002).

**II.    Bagley cannot establish a prima facie case of race discrimination under Title VII.**

Applying the heightened standard under *Duffy*, Bagley, a white male and therefore a member of the majority class, cannot make out a prima facie case of discrimination on the account

of his race.  Bagley claims the District's interview panel rated him higher than English on the scoring rubric, but English was ultimately hired for the position.  Bagley claims "[t]he School Board ditched its own evaluation process when it was discovered that [he] scored the highest on the rubrics which were being used to measure candidates... [the] motivating reason for the School Board's action was that [he] was a white man rather than a black woman."  *Id.* at 6.  This is Bagley's keystone argument.  Bagley supports this contention with two observations: (1) all of the District's interview panel and board participants were Black; and (2) the Board has a history of discrimination against white applicants for administrative positions.  *Id.* at ¶¶ 19-23.

While the District's interview panel did consist of all Black men and women, Bagley provides no factual support that the panel did not hire him because he was non-Black or that the Board has a history of discrimination.  In fact, the Board could not have a history of discrimination because the Board had little to no history at all and had never hired a superintendent.  The District was under state control from 2011until 2016, wherein the Arkansas Secretary of Education served as the school board and made all final decisions, on behalf of the Arkansas State Board of Education.  *See* Affidavit of Linda English, attached to Defendants' Motion as <u>Exhibit 1</u>, and Ark. Code Ann. § 6-20-1909.  While the District was under state control it had an advisory board, only, and had no binding vote on District matters.  *See* Deposition of Plaintiff at p. 21, attached to Defendants' Motion as <u>Exhibit 2</u>.  All allegations in Bagley's Complaint about the District having a history of discrimination predate the current Board members that are defendants in this lawsuit, and the District acts through its Board members.  *See* Complaint at ¶ 19.

Accordingly, since the District acts through its school board, and the Board at issue had never hired a superintendent prior to this instance, Bagley cannot possibly prove this employer is inclined to discriminate against white candidates.  However, even if this Court is to consider the

hiring tendencies of prior school boards of the District, the District had a white male superintendent and white female superintendent since 2008.  *See* Ex. 1 (English Affidavit).

Under the heightened reverse discrimination standard, if Bagley cannot show the District is one that discriminates against white applicants, he must present evidence indicating that there is something "fishy" about the facts of the case at hand that raises an inference of discrimination, and this is done in the *prima facie* showing.  *See Mower,* 177 F. Supp. 2d at 949 (S.D. Iowa 2001). Bagley's argument for discrimination rests heavily on the Board's interview scores, drawing the conclusion that because his interview scores were "higher" and he did not get the job, he must have been discriminated against because of his race.  *See* Complaint at ¶ 22.  Bagley overstates how "substantial" his interview scores were.

First, the interview committee was not comprised of the entire Board, but only three of the seven Board members, less than a majority, and two additional community members appointed by various Board members.  *See* Deposition of Earnest Simpson at p. 11, attached to Defendants' Motion as Exhibit 3.  Legally, only the elected school board can hire a superintendent, so the input of the two community members on the interview committee was just that, input.  *See* Ark. Code Ann. § 6-13-620(5)(A).  The six Board members would vote on the selection since board member Bagley had recused and the community members could not.  *Id*.  The composition of the interview committee alone shows it was not the final determination, and the scores of that committee did not include any scoring from the three board members that did not participate.

Even considering non-binding scores of the interview committee, the scores were used as a ranking to determine where the interviewees ranked amongst each other.  *See* Ex. 3 at p. 28-30 (E. Simpson Deposition).  Both Board members Davis and Simpson testified that the interview committee's input was not binding on the Board.  *Id.* at 35; *see also* Sanetta Davis Deposition,

attached to Defendants' Motion as <u>Exhibit 4</u>, at p. 49.   The Board quickly determined that the rankings from the interview committee were not properly calculated.  *See* Ex. 3 at p. 28-30.  For example, Bagley received "perfect scores" in the areas of experience and credentials—an obvious miscalculation considering Bagley lacked related experience and did not have the proper credentials for the superintendent position—no superintendent license.  *Id.*; *see also* Bagley resume and Bagley Arkansas Licensure, attached to Defendants' Motion as <u>Exhibits 5 and 6</u>.

Board member Simpson testified that he had been on interview teams in the past, "never have we had anybody get a perfect score, even in the area for experience…as far as being over or supervising anybody, none… [Bagley had] no experience at all."  *See* Ex. 3 at p. 29-30.   Simpson continued, "As far as credentials, you know, he doesn't have a superintendent's license, doesn't have a doctorate degree… but he got a perfect score."  *Id.* at 30.  The interview points were simply a guide in decision making, and when the guide turned out the be flawed, the Board simply used alternative means to determine which candidate was the best fit for the position.  *Id.* at 38-39.  Board President Sanetta Davis testified that Bagley's interview scores did not match his actual experience, "After the Board went through [interview score sheets], it was apparent at that time that we had some problems with the scoring of some of the sheets… it's not possible for you to answer that as "great" when [the interviewee] does not have it."  *See* Ex. 4 at p. 43 and 44.  Here, Davis is specifically referring to a perfect score that Bagley received for experience, despite having no administration background at all.  *Id.*

Simpson further testified that the District *did not* typically give a job to the person who scored the highest in the interview process, citing his own experience.  *See* Ex. 3 at 34-35.  Simpson interviewed in 2002 or 2003 for a principal's position in the District, and despite receiving the highest scores did not get the job.  *See* Ex. 3 at p. 35.  When asked what happened after Bagley

was scored the highest, Davis testified, "Just because you got the highest score doesn't mean we have to take you… no one says that we have to hire you because you got the highest score… the board had their own vote." *See* Ex. 4 at p. 48-49. She continued, "there was nothing in writing that says the highest score should be selected as superintendent." *Id.* at 34. Davis was specifically referring to the Board's ability to pivot, regardless of whether the interview scores had been done correctly. *Id*. at 48-50. The Board had the ability to vote as they pleased, and there was never an obligation to vote in line with the scoring rubric. *Id*. Therefore, both Simpson and Davis testified that the interview committee's scoring was not binding; the purpose was to provide input to the Board when it came time to vote.

Accordingly, understanding the facts surrounding the scores, Bagley has no argument to rely on which might indicate that anything "fishy" occurred. Bagley cannot meet his heightened burden of proving a prima facie case. Beyond Bagley's inaccurate contentions, he fails to highlight a single comment, remark or action by any of the Defendants that reflects a discriminatory attitude or animus towards white males. Bagley's claims must fail.

### III.   In the alternative, should Bagley establish a prima facie case of discrimination, his claim still cannot succeed as the District had legitimate, nondiscriminatory reasons for its conduct.

Assuming, *arguendo*, that Plaintiff can establish a prima facie case of gender or race discrimination, a legal presumption of discrimination arises and the burden shifts to the District to produce evidence of a legitimate, nondiscriminatory reason for its behavior. *Stuart v. GMC*, 217 F.3d 621, 634 (8th Cir. 2000). To articulate a legitimate, nondiscriminatory reason, the District must present admissible evidence sufficient to raise a genuine factual issue as to whether the Plaintiff was discriminated against. *Texas Dep't of Cmty. Affairs*, 450 U.S. at 254. As initially

noted above, this burden is not onerous.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011).

### A.  English was far and above more qualified for the position.

Put simply, English was an objectively more qualified candidate for the position of superintendent.  English, the prevailing candidate, had an objectively more diverse education history, more detailed work history, had more direct experience with the position, and came highly recommended by respected faculty.  The following table outlines the objectively greater qualifications of English over Bagley.

| | LINDA ENGLISH | NATHAN BAGLEY |
|---|---|---|
| Years in Public School Education | 26 | 2 |
| Years of Education Administrative Experience | 16 | 0 |
| Education Level | B.S. in Elementary Education M.S. in Gifted, Talented and Creative Ed.S. in Education Administration (Education Specialist, post master's degree) | Bachelor of Arts Master of Arts |
| District Administrator License | Yes | No |
| Number of Public School Licenses | 8 | 1 |
| Years of Superintendent Experience | 7 | 0 |

*See* Bagley Resume, attached to Defendants' Motion as <u>Exhibit 5</u>; *see also* Bagley State of Arkansas Educator License, attached to Defendants' Motion as <u>Exhibit 6</u>; *see also* English Resume, attached to Defendants' Motion as <u>Exhibit 7</u>; *see also* English State of Arkansas Educator License, attached to Defendants' Motion as <u>Exhibit 8</u>.

Bagley did not possess a superintendent's license, had no experience as a school administrator and was only a K-12 instructor for a total of 2 years.  *See* Ex. 5; *see also* Ex. 2, (Pl. Dep.) at p. 167.  Bagley even conceded classroom teaching was not suitable for him because of the extensive hours it required.  *Id.* at 79-80.  Indeed, Bagley opted for a career as an instructor at the Phillip's Community College, where the weekly hourly commitment is considerably less than that of a k-12 teacher.  *Id*.  Bagley testified a k-12 teacher must be with students 35 hours a week, but at Phillips Community College, his hourly obligation for students is approximately 10 hours per week.  *Id*.  Bagley's entitlement shows no bounds.  He is scarcely qualified to be a teacher in the District yet brings this lawsuit because he was not selected for the highest-ranking position in the same District.

Bagley did not have the most basic necessity for the position—a superintendent's license. *Id.* at 167.   At the time that Bagley was interviewing for the position, the District was under a state-issued waiver for superintendent licensure, meaning it could legally hire a superintendent without a license, as long as the waiver was in effect.  *Id.* at 36.  The waiver, conditionally granted and with an expiration, allowed the District to hire a candidate without a superintendent's license. *Id*.  Bagley would not have been able to apply for the position had the waiver for a superintendent's license not been in place.  As Bagley explained, this particular waiver was one of several waivers the District received from the State Board of Education, and the District was able to acquire this

waiver because a local conversion charter school received the same waiver. *See* Ex. 2 at p. 28-31. In Bagley's deposition he admitted that he was heavily involved in the District's efforts to acquire the state-issued waiver for a superintendent to not be licensed, acknowledging he testified to the Arkansas Legislature regarding the matter and submitted the waiver request to the Arkansas Board of Education. *See* Ex. 2 at p. 27-36. Indeed, it was Bagley who had lobbied the State Board of Education for the waiver, admitting that in his opinion he felt it was an effective mechanism for hiring a superintendent, but there is no evidence that this particular Board had a desire to hire a superintendent without standard qualifications. *Id*. at 26-37.

Even if Bagley were able to show that he would have been *eligible* to hold the position based on the particular waiver, Bagley still cannot show that he had adequate credentials or experience. Certainly, Bagley cannot show that he was more qualified, as he had zero experience as a school administrator. On the other hand, the prevailing candidate, English, had 16 years of administrative experience in Arkansas school districts, and a total of 26 years in public school education. *See* Ex. 7. English, the prevailing candidate, did have the proper qualifications, including a bachelor's degree, a master's degree, and an Ed.S. degree. *Id*. English had an objectively more diverse education history, more detailed work history, had more direct experience with the position, and came highly recommended by respected peers. *Id*. English was a Deputy Superintendent for the Helena-West Helena School District at the time she interviewed for the Superintendent position and was the interim superintendent one year prior to being named the permanent superintendent, the event that triggered Bagley's EEOC Charge. *Id*. English had served as the interim deputy superintendent for the District prior to that; had served as director of elementary education for two years; a director of secondary education for two years; an assistant superintendent for Brinkley School District; an interim superintendent at Brinkley; and a

curriculum coordinator at Brinkley.  *Id*.  English had a total 16 years of administration experience to Bagley's zero years of administration experience.  *Id.*; *see also* Ex. 5.

Even putting English's obviously superior experience and education aside, Bagley in his own admission was not adequately certified for the position for which he applied.  Bagley admitted he told the District Board he was interested in the vacant superintendent position while he was the sitting Board president and said, "Well, if y'all want me, let's go ahead and do this, and let's get to work," referring to him serving as superintendent without a license.  *Id.* at 42.  Bagley testified that he insisted that the Board put him in the superintendent position without an interview process — "it wouldn't have been illegal," referring to the Board naming him superintendent without a search process.  *Id*.  At a board meeting preceding interviews for the superintendent position, Bagley convinced the Board not to hire an outside company to find the District a highly qualified superintendent.  *See* Ex. 4 at p. 18-20.  At the same meeting, Bagley almost convinced the Board to give him a three-year superintendent contract on the spot.  *Id*.  Simpson voiced that there needed to be an interview process and the Board agreed.  *Id*.  Bagley has shown his hand and was clearly attempting to avoid an interview process where he would have been severely underqualified.

   **B.  It was the District's right, as an employer, to select whichever candidate it decided was best suited for the position, so long as its decision was not based on discriminatory criterion.**

It is an official duty of the Board to elect and employ a superintendent.  *See* Helena-West Helena Board Policy, attached to Defendants' Motion as Exhibit 9, at 2, ¶ 1.7.3. While an employer's selection of a less qualified candidate *can* support a finding that an employer's nondiscriminatory reason for the hiring was pretextual, it is ultimately the role of the Ex-employer to identify the strengths that constitute the best qualified applicant.  *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004).  This is so because "the employment-discrimination laws have

not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). Consequently, an employer is free to select its own criteria for evaluating and selecting candidates for employment, and a court cannot second guess the employer's chosen selected criteria or suggest what qualifications should be given the most weight, so long as it does not impermissibly discriminate. *Carlisle v. St. Charles Sch. Dist.*, 507 F. Supp. 2d 1018, 1025 (E.D. Mo. 2007). The decision to select one candidate over another, despite differences in training and education, is not illegal as long as the decision was not based on an ulterior, racially discriminatory motive. *Carlisle*, 507 F. Supp. at 1027.

The District's Board operates in the belief that its actions are in the best interest of its students and the District as a whole. *See* Ex. 9, at 2. Employing a superintendent is an official duty of the Board. *Id.* The Board set out to fulfill its duty on behalf of the District when it awarded English the position over Bagley and the other candidates vying for the superintendent position.

As members of the Board, it was their duty to select the individual most suited for the position of superintendent. This decision, in and of itself, is not an illegal one, so long as that decision was not based on a discriminatory motive. *Carlisle v. St. Charles Sch. Dist.*, 507 F. Supp. 2d 1018, 1027 (E.D. Mo. 2007). Merely asserting that the Board did not select the highest scoring candidate, on an arbitrary rubric, does not make its decision actionable, as it is ultimately the Board's prerogative to identify who it thinks is the best candidate for the job. *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004). Bagley demonstrated in his own right that he was not suited for the Position, according to Board members, by throwing temper tantrums when he did

not get his way.   Davis testified Bagley did not conduct himself in a manner suitable to hold the

superintendent position.   *See* Ex. 4 at p. 58-59.   Davis testified that Bagley did not have the

experience and was not qualified for the position when other candidates who interviewed were

both experienced and qualified.   *See* Ex. 4 at p. 60-62.   Both Davis and Simpson testified that

Bagley was motivated by self-interest and treated others poorly when he did not get his way.   *Id.*

at 58-59; *see also* Ex. 3 at p. 25-26.   In response to Bagley's attorney asking if there was anything

Simpson wanted him to know, Simpson testified:

> Mr. Bagley has a temper. He, you know, had a situation… with one
> of our principals.  And I don't care what a person does, there's a way
> to handle it.  And it was all on Facebook, where he's shaking his
> finger in her face, and this was a black lady that, you know, he was
> doing this to.  And then we had an incident here after one of the
> board meetings, he got in Ms. Davis's face, shaking his finger in her
> face and talking about she had lied to him and that kind of thing, and
> said she was going to support him.  And that kind of temper we don't
> need leading this district… And then, you know, the times we didn't
> vote the way he wanted us to vote, you know, we're individuals.
> We've got our own rights to vote like we want to vote, but he felt
> like he was supposed to control our vote and we were supposed to
> vote whichever way he wanted us to vote, you know… And so all
> those things, you know, we looked at, and I don't think that we need
> anybody serving this district with that kind of personality, and it had
> nothing to do with his color.

Ex. 3 at p. 70-71.  Davis mirrored Simpson's sentiments, "if you don't do what Bagley wants you

to do, he throws this temper tantrum, he yells and screams and points his finger in your face… If

you do not do what he says do, he is going to hit the table and he is going to scream and yell…

I do know that in order to be a superintendent, you cannot conduct yourself in that manner, in that

you yell and scream and point your finger in people's faces." Ex. 4 at p. 58-59.   Simpson stated

further:

> [W]e had not seen Mr. Bagley's experience in working with others
> as him being their supervisor. We had seen the outbursts that he had
> had when things didn't go his way.  We'd seen that, and that in

> itself—I think as a superintendent you have to know how to deal
> with people.  You have to know how to work with people and
> communicate with people.   And as long as things are going
> Mr. Bagley's way, he's ok, but you know, when it's not going his
> way, then he's a different person.

Ex. 3 at p. 75-76.  In February of 2018, Bagley was in a verbal altercation with a principal in the

District, and video evidence showed Bagley yelling and pointing his finger in close proximity to

the principal's face.  See Ex. 4 at 59-60; See also Ex. 2 at 120-123.  As was testified, the Board

was well aware of Bagley's propensity for outbursts.  The District's Board members clearly

provided legitimate reasons for choosing English over Bagley.

Naturally, in response to Simpson's damning testimony, Bagley's attorney asked how

Bagley was even allowed to make the "final cut"—being in the group of 4 individuals that were

interviewed from an original 13 applicants.  *See* Ex. 3 at p. 76-77.  Simpson responded, "…he was

from here, and we wanted to give him the opportunity… I guess it was common courtesy, not

common courtesy, but just courtesy, that we gave him an interview for it."  *Id*.  Bagley's attorney

asked Davis, "Why do you think [Bagley] should not prevail on his claim that the district has

discriminated against him?"  Ex. 4 at p. 64-67.  Davis responded, "the District has not

discriminated against Bagley.  He should not prevail because that's not true… It had nothing to do

with race."  *Id*.

The Board, operating from the belief that its decision was in the best interest of its students

and the District, voted to award the permanent position of Superintendent to English, who had

qualifications beyond that of Bagley.  As an employer, it was the Board's right to select its

preferred candidate over other candidates.  English's qualifications coupled with the Board's

apprehension for Bagley, demonstrate that it had legitimate, nondiscriminatory reasons for

declining to select Bagley for the position of Superintendent.

IV.    **Bagley cannot prove the District's reasons for failing to hire him as Superintendent were a pretext for racial discrimination.**

Assuming, *arguendo*, that Bagley can establish a prima facie case of discrimination, *McDonnell Douglas* directs that the burden shifts to the District to articulate a nondiscriminatory, legitimate basis for its decision, of which it has provided.  As the District has met this burden, Bagley must provide a genuine issue of material fact showing that these reasons were merely a pretext for discrimination.  *See Barber v. Cl Truck Driver Training, LLC*, 656 F.3d 782, 792 (8th Cir. 2011).

"To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (quoting *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1072 (8th Cir. 1998)). "This burden will not be met by simply showing that the reason advanced by the employer was false; rather, [the plaintiff] must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations." *Wilking,* 153 F.3d at 874 (quoting *Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996)). "Specifically, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Id.* at 874 (quoting *Matthews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998)). "[M]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the employer's] legitimate, nondiscriminatory explanation." *Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 992 (8th Cir. 2006).

Bagley could have established that the Board's decision not to select him for the Superintendent position was pretextual in one of several ways.  First, Plaintiff could have relied on a strong prima facie case as a showing of such can establish evidence of pretext. *Smith v. Allen*

*Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).  At the pretext stage, though, "[a]n employee's attempt to prove pretext […] requires more substantial evidence [than it takes to make a prima facie case.]"  *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (quoting *Smith*, 302 F.3d at 834) (internal quotations omitted).  Bagley's prima facie case, however, is far too weak to allow a fact finder to conclude that the District's reasons were merely pretextual.  In asserting his prima facie case, Bagley was not able to definitively establish the necessary requirements to make a showing of race discrimination as he was simply not qualified for the position and the circumstances to not give rise to an inference of discrimination.  Even if he had been able to make prima facie showing on any of his claims, the District has still articulated several legitimate nondiscriminatory reasons for its conduct.

Plaintiff could also have attempted to prove pretext by showing that the District's proffered reasons for its decision had "no basis in fact."  *Smith*, 302 F.3d at 834. The Board, however, has put forth undisputed evidence that Plaintiff was not well suited for the position of Superintendent, in qualification or demeanor.  It does not matter whether these concerns were 100-percent factually accurate, as "the burden will not be met by simply showing that the reason advanced by the employer was false."  *Wilking,* 153 F.3d at 874 (quoting *Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996)).  What matters is that, at the time, the Board had developed legitimate concerns as to Bagley's qualifications, eligibility and capabilities.  Further, it was within the Board's purview as an employer to select English over Bagley, as there was no question she possessed the objective qualifications.  *Carlisle*, 507 F. Supp. at 1025.  These are legitimate nondiscriminatory reasons for the Board's decision.

In his Complaint, Bagley speculates that he was equally qualified with English, and contends multiple times that if he were not white, he would be sitting in the superintendent's office.

20

*See* Ex. 2 at p. 111.  Bagley provides no evidence to support this contention beyond noting his track record and the alleged racism of all the members of the Board and District.  English clearly had more applicable experience and had the necessary qualifications to maintain the position. Bagley on the other hand was only eligible under the District's waivers and would have been ineligible for the position in the years following his appointment.  Additionally, Bagley's claims concerning the District's School Board are completely illogical and are easily explained away by Davis's and Simpson's testimonies.

Beyond this mere speculation, Bagley has not offered any evidence to support a claim of pretext, which requires him to demonstrate that the Board's reasons were false *and* that an intentionally discriminatory motive was the real reason that he was not selected for the superintendent position.  Bagley has not provided any reasonable proof that the Board's justifications for hiring English over him were not legitimate and compelling, nor has he provided any evidence tying the Board's decision to a racial motive, therefore his claim must fail and the Defendants are entitled to summary judgment.

### V.     Any racial discrimination claim asserted by Bagley under 42 U.S.C. § 1981 or 42 U.S.C. § 1983 fails for the same reasons considered above.

The United States Court of Appeals for the Eighth Circuit has held that a § 1983 claim based on alleged violations of equal protection in the employment context is analyzed in the same way as a Title VII claim of sex, race, or religious discrimination.  *Hicks v. St. Mary's Honor Ctr.*, 970 F.2d 487 (490-91) (8th Cir. 1992), rev'd on other grounds, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Richmond v. Board of Regents of Univ. of Minnesota*, 957 F.2d 595, 598 (8th Cir. 1992) (burden of showing prima facie case of discrimination is the same under Title VII, § 1981, § 1983, or the IDEA); *Briggs v. Anderson*, 796 F.2d 1009, 1021 (8th Cir. 1986) (inquiry into intentional discrimination for individual actions brought under §§ 1981 and 1983 is

essentially the same inquiry under Title VII); *Craik v. Minnesota State Univ. Bd.*, 732 F.2d 465, 468 n. 5 (8th Cir. 1984) (issue of discriminatory intent is common to analyses under Fourteenth Amendment, § 1983, and Title VII).  Accordingly, Bagley's § 1981 and § 1983 claims for racial discrimination fail for the same reasons considered above.

**VI.    Defendants should not be subject to liability in their personal capacities and a request for punitive damages is improper.**

Bagley has implicated Defendants Loistyne Burrell, Sanetta Davis, Lynn Boone, Earnest Simpson, Jr., Daniel Strickland, Janice Williams, Troy Bobo in both their official and personal capacities.  Under 42 U.S.C. § 1983, a public official may be sued in his or her official capacity, individual capacity or both.  *Rumery v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  To succeed on an action against a public official in his individual capacity, "a plaintiff must show that the defendant violated 'clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 1789 (1991).

In his Complaint, Bagley produces little evidence to support his claims of racial discrimination.  At best, Bagley establishes a prima facie case of discrimination, but Defendants have provided several legitimate and nondiscriminatory reasons to support its conduct and rebut this case.  Further, Bagley has not established that Defendants *clearly* violated his statutory or constitutional rights.  As a result, the request to subject Defendants to personal liability is improper and should be dismissed.

Bagley also contends that he is entitled to an award of punitive damages under 42 U.S.C. § 1981.  Punitive damages are available in claims vested under Title VII but are "limited to cases in which an employer has engaged in intentional discrimination and has done so with malice or reckless indifference to the federally protected rights of an aggrieved individual."  *Kolstad v. ADA*,

527 U.S. 526, 534 (1999). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535. Moreover, in the context of § 1981a, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages. *Id.*

Bagley has not demonstrated that Defendants either definitively knew or perceived that they would be in violation of federal law by failing to select Bagley for the position of Superintendent. As the Defendants' alleged bad acts do not rise to the level of "malice" or "reckless indifference" as contemplated by the Supreme Court, Bagley's request for punitive damages is improper and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants, Helena-West Helena School District, Loistyne Burrell, Sanetta Davis, Lynn Boone, Earnest Simpson, Jr., Daniel Strickland, Janice Williams, Troy Bobo, individually and in their official capacity, respectfully submit that they are entitled to judgment as a matter of law and that Bagley's Complaint be dismissed with prejudice.

In the alternative only, Defendants respectfully request that Loistyne Burrell, Sanetta Davis, Lynn Boone, Earnest Simpson, Jr., Daniel Strickland, Janice Williams, Troy Bobo be dismissed in their personal capacities as each was acting in an official capacity at the time of the alleged intentional discrimination. Defendants further request that Bagley's request for punitive damages be dismissed.

Respectfully submitted,

BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax: (501) 374-5092
Email: jbequette@bbpalaw.com
Email: ckees@bbpalaw.com

By: _____**W. Cody Kees**_____
      Jay Bequette, Ark. Bar #87012
      W. Cody Kees, Ark. Bar #2012118
      Teddy Stewart, Ark. Bar #2018189

And

BEAVERS & CLINE
P.O. Box 924
Forrest City, AR 72336
Phone: (870) 633-3141
Fax: (870) 633-3594
Email: brbeavers@sbcglobal.net

By: _____**Brad Beavers**_____
      Brad Beavers, #81012